AHNE *v.* THE REINHART AND DONOVAN CO.

5-3798                                    401 S. W. 2d 565

Opinion delivered April 18, 1966

*J. H. Evans,* for appellant.

*Smith, Leaming* and *Swan,* Oklahoma City, Okla.;
*Warner, Warner, Ragon & Smith,* for appellee.

*William J. Smith, Ben Allen,* amici curiae.

OSRO COBB, Justice. On July 26, 1905, George Heim
and Lizzie Heim, his wife, executed and delivered their
deed to Arkansas Anthracite Coal Company conveying
"all of the coal, oil and mineral" lying in and under
the SE¼ NE¼, Sec. 15, Township 8 North, Range 24
West, in Logan County.

Appellants are successors to the fee title of George
Heim and Lizzie Heim, subject to the mineral divesti-
ture represented in the deed of July 26, 1905.

Appellee, The Reinhart and Donovan Company, is the successor in title to the minerals conveyed by the Heim deed.

Appellee W. R. Wilson, Jr. is a lessee of said mineral interests from appellee The Reinhart and Donovan Company.

The Reinhart and Donovan Company brought this action in chancery court seeking a judgment declaring their sole ownership of the coal, oil, *gas* and other minerals in and under subject lands. (Emphasis ours). It will be noted that gas was not specifically named as a mineral being conveyed in the Heim deed. Appellants resisted the action by filing an answer alleging that in July of 1905 gas was not commonly recognized as a mineral in the locality where subject land was situated and that gas could not have been and was not conveyed directly or by inference in the Heim deed of 1905. This defense asserted by appellants was obviously bottomed upon our holding in *Stegall* v. *Bugh,* 228 Ark. 632, 310 S. W. 2d 251 (1958), and supporting case authorites cited in that opinion.

The issues joined presented a fact question as to whether gas was a commonly recognized mineral in Logan County in 1905 when the Heim deed was executed, and the fact question was submitted to the chancellor upon a comprehensive array of historical exhibits and was determined adversely to appellants. The case is here on appeal, the dispositive question being whether the chancellor erred in his finding as a fact that gas was a commonly recognized mineral in Logan County when the Heim deed was executed on July 26, 1905.

We now refer to some of the more pertinent exhibits which were before the chancellor.

1. Exhibit A-11: *Outlines of Arkansas Mineral Sources,* by George C. Branner, State Geologist, published by the Bureau of Mines, Manufactures

and Agriculture and State Geology Survey (1927).

This publication recognized two natural gas-producing areas in Arkansas—one being the western end of the Arkansas valley, including Scott, Sebastian, Crawford and Johnson Counties, and the other being southwestern Arkansas, including Union, Ouachita, and Columbia Counties. A field was discovered in Sebastian County on November 5, 1904, and was producing up to the time of this report. The Mansfield field was discovered in Scott and Sebastian Counties in 1902 and was used in Huntington and Mansfield domestically. This report contains a graph which shows some but little natural gas production in Arkansas in 1907.

2. Exhibit B: "The Early History of Oil and Gas Leasing in the Arkansas Valley," by Park Sullivan. (1965)

This article states that most professional land men in the Arkansas valley of northern Arkansas agree that the word "mineral" included "gas" after 1900. The author states that 1900 was the earliest year in which there was evidence of the growing realization of petroleum as an economic mineral. It was at this time that people began to trade in oil and gas as opposed to hard rock minerals. Also it was about this time that there was a cohesion in the business world that overrode the arbitrary political boundaries of counties, and individuals engaged in mineral trading were thinking along regional lines. There was some activity pertaining to oil and gas leases in Logan County dated May 2, 1896. *In 1901, Choctaw Oil Company (a number of incorporators of this company were from Paris, Arkansas) put together a sizable block of acreage as to oil and gas royalties in Logan County. Choctaw Oil Company drilled wells pursuant to these leases.* (Emphasis ours.) There is also evidence of other leases which were undated but acknowledged in the summer of 1901 covering lands scattered throughout

southern Logan County. The author of this article concludes that after 1900, business and professional communities in the various counties along the Arkansas River in Arkansas recognized the economic importance of oil and "gas," that these minerals were subject to exploitation, and the word "mineral" included oil and "gas."

3. Exhibit H: *Minerals in Arkansas,* published by the Bureau of Mines, Manufactures and Agriculture, compiled by Jim Ferguson, Commissioner (1922).

This publication reveals that there were two natural gas fields in Arkansas in 1922. The Fort Smith field at the time had been producing for twenty years, and the El Dorado field for about one year.

4. Exhibit A-7: A letter to Mr. B. B. Chisholm from John C. Branner, dated July 27, 1895.

This letter suggests that one of the two best places in the state of Arkansas for prospecting for oil and gas in 1895 was an area in Logan County.

5. Exhibit A-8: *Arkansas Gazette,* 1888.

On November 25, 1888, the *Gazette* carried an article enlightening the public on the discovery of gas in Fort Smith. On June 14, 1888, the *Gazette* carried an article discussing the prospecting of gas fields in the area around Prairie Grove, Washington County, Arkansas.

6. Exhibit A: 'Early History of Petroleum Exploration and Production in the Arkansas Valley, by John P. Schields, Consultant Geologist.

The author of this article points out that with the publication of a Geological Survey of Arkansas in 1892 which showed prominent anticlines in Logan, Johnson, Sebastian and Scott Counties, the population of these counties became aware of the potential presence of petroleum (oil and gas) in the area. The

landowners were informed that their property was enhanced by the potential presence of petroleum by the geologists who entered the area pursuant to the 1892 Geological Survey and Map. During this period, newspaper articles were also being published concerning the oil and gas possessions in the area. This article also substantiates Mr. Sullivan's observations which were enumerated above.

The historical accuracy of "The Early History of Oil and Gas Leasing in the Arkansas Valley," by Park Sullivan, as quoted above, is not challenged, and this report established to our satisfaction that both oil and gas were commonly recognized minerals in Logan County as early as 1901.

In 1941 this court, in a landmark case, *Missouri Pac. R.R. Co., Thompson, Trustee,* v. *Strohacker,* 202 Ark. 645, 152 S. W. 2d 557 (1941), held that deeds executed in 1892 and 1893 in Miller County reserving "all coal and mineral deposits" did not constitute a valid reservation of oil and gas minerals, for the reason that such substances were not commonly recognized as minerals in Miller County at the time of the execution of said deeds. The court said:

"If the reservations had been made at a time when oil and gas production, or explorations, were general, and legal or commercial usage had assumed them to be within the term 'minerals,' certainly appellant should prevail."

We quote further from the *Strohacker* case:

"In most of the decisions holding that oil and gas were included in reservations of minerals, there were circumstances denoting such intent; and, where purposes of the parties can be ascertained from a writing or from general customs, and effect can be given such intentions without impinging a settled rule of law, it should be done. *Beasley* v. *Shinn,* 201 Ark. 31, 144 S. W. 2d 710, 131 A.L.R. 1234."

"We agree with Chief Justice Gibson of Pennsylvania that 'The best construction is that which is made by viewing the subject of the contract as the mass of mankind would view it; for it may be safely assumed that such was the aspect in which the parties themselves viewed it.' *Schuylkill Nav. Co.* v. *Moore*, 2 Whart. (Pa.) 477."

In *Missouri Pac. R.R. Co., Thompson, Trustee,* v. *Furqueron,* 210 Ark. 460, 196 S. W. 2d 588 (1946), we noted:

"While the record in the present case reflects some additional testimony, in effect, it is substantially the same as that in the *Strohacker* case, *supra,* to which reefrence is made for a somewhat detailed statement of the facts. Appellant insists with much earnestness, however, that we should overrule the *Strohacker* case, as being unsound and not in accord with the weight of authority. We cannot agree."

In our most recent decision involving construction of an instrument containing reservations, *Stegall* v. *Bugh, supra,* relied upon by both parties to the appeal, we adhered to the principles of construction of such instruments announced in *Missouri Pac. R.R. Co.* v. *Strohacker, supra.* Thus for the past twenty-five years it has been the settled rule of this court that, where there is ambiguity as to minerals actually embraced in instruments purporting to convey or to reserve certain unspecified minerals under generalized terms as to minerals, a fact question is presented as to the true intent of the parties; and in such cases the contemporary facts and circumstances surrounding the execution of the instrument are admissible in evidence on the question. Furthermore, the intent of the parties will be determined so as to be consistent with and limited to those minerals commonly known and recognized by legal or commercial usage in the area where the instrument was executed.

Appellee states in its brief, "Certainly the rule put forth in the *Strohacker, Bugh* and *Brizzolara* cases is consistent with the rules of law affecting real property conveyances generally." We agree.

Different factual situations have existed and may continue to exist as to what substances constitute commonly known and recognized minerals in various areas of the state. It was apparently for this precise reason that the court recognized the need for such a rule of construction as that announced in the *Strohacker* case.

Based upon our recitals as to the facts in this case and as to the applicable principles of law, we have concluded that the finding of the chancellor that gas was a commonly recognized mineral in Logan County on July 26, 1905, is not against the preponderance of the evidence in this case and that the judgment entered thereon should not be disturbed.

Affirmed.

AMSLER, J., not participating.

MCFADDIN, J., concurs in part and dissents in part.

ED. F. MCFADDIN, Justice, concurring in part and dissenting in part. I agree that oil and gas were generally recognized as minerals in 1905, so I concur with the Majority in affirming the decree here challenged. But I dissent from the reasoning which the Majority Opinion uses to reach such affirmance. I call attention again to the views I expressed in my dissenting opinion in *Stegall* v. *Bugh,* 228 Ark. 632, 310 S. W. 2d 251; and I express the hope that this Court will ultimately see fit to fix a date applicable to the entire State of Arkansas when oil and gas became generally recognized as minerals.

As I view the cases, we now seem to be proceeding on a *county by county basis,* because the Majority Opinion in the present case says: " . . . we have con-

cluded that the finding of the Chancellor that gas was a commonly recognized mineral in Logan County on July 26, 1905, is not against the preponderance of the evidence in this case and that the judgment entered upon this finding should not be disturbed.''

On this matter, of how to determine when oil and gas were recognized as minerals, we have drifted like a ''ship without a rudder,'' as quotations from our cases will show.

(a) We started out in the *Strohacker*[1] case in 1941 by saying it was the *intention of the grantor* that determined the issue, and we said:

''Our task is to decide what Iron Mountain meant when it reserved 'all coal and mineral deposits.' Although there were court decisions holding oil and gas to be minerals, such was not the general construction; and this was particularly true in a country where oil and gas were not given the slightest commercial consideration in connection with land values. 'All coal and mineral deposits' undoubtedly were thought to mean, in addition to coal, deposits of substances commonly recognized as minerals, . . .''

(b) Then, in the *Furqueron*[2] case in 1946, we quoted a headnote from the *Strohacker* case which included both the intention of the *grantor and the intention of the grantee* in the deed, for the said headnote reads:

'' 'By excluding from deeds executed in 1892 and 1893 ''all coal and mineral deposits'' pertaining to lands in Miller County, Arkansas, accruing to railroad company through government grants, the company no doubt had in mind, as did its grantees,

---

[1] *Mo. Pac. Rd. Co.* v. *Strohacker*, 202 Ark. 645, 152 S. W. 2d 557.
[2] *Mo. Pac. Rd. Co.* v. *Furqueron*, 210 Ark. 460, 196 S. W. 2d 588.

only substances then commonly recognized as minerals; and in view of such intent the language was not sufficient to reserve oil and gas.' ''

(c)   Then in the *Carson*[3] case in 1948, we again tested the mineral question by the *mutual intention of the parties,* for we said:

"We conclude that the rule announced in the *Strohacker* case, *supra,* as well as the unreasonableness, under the circumstances, of the construction asserted by appellee, requires a holding that bauxite was not in the contemplation of the parties to the contract when this reservation of mineral rights was made."

(d)   In the *Brizzolara*[4] case in 1949, we still tested the mineral question with the "intent with which the words were used," for we there said:

" . . . the rule deals with a question of fact rather than of law." " . . . the question involves the intent with which these words were used in a different deed in 1897. At the trial neither party offered proof on this point, . . . " ' . . . we think it best to remand so that the facts may be ascertained."

(e)   But when we decided the *Stegall*[5] case in 1958, we departed entirely from what the parties to the conveyance intended, and went to the test of *what the word mineral was generally understood to mean at the time of the conveyance,* for we said:

"We think that the meaning which this court has heretofore and should hereafter give to the word *'mineral,'* in connection with its use in situations similar to those of this case, is governed not by what the grantor meant or might have meant, but

---

[3]*Carson* v. *Mo. Pac. RR. Co.*, 212 Ark. 963, 209 S. W. 2d 97.
[4]*Brizzolara* v. *Powell*, 214 Ark. 870, 218 S. W. 2d. 728.
[5]*Stegall* v. *Bugh*, 228 Ark. 632, 310 S. W. 2d 251.

by the general legal or commercial usage of the word at the time and place of its usage.''

(f)   And now, in the present case, we seem to be going to a *county by county* basis to determine when oil and gas became recognized as minerals, for the Opinion herein contains the language already quoted, which is, '' . . . we have concluded that the finding of the Chancellor that gas was a commonly recognized mineral in Logan County on July 26, 1905, is not against the preponderance of the evidence in this case and that the judgment entered upon this finding should not be disturbed.''

So we have gone from what the grantor intended, to what the parties intended, to what was generally understood in the locality, to what was understood in the particular county in which the land was located. It now seems that there will have to be a case brought to this Court from each of the seventy-five counties in Arkansas to have determined when oil and gas were first generally recognized as a mineral, in each such county; and it is from that line of holdings that I must necessarily dissent. As I tried to point out in my dissent in *Stegall,* I insist that oil and gas were generally considered to be minerals in all of Arkansas as early as January 1, 1900. I wish this Court would so state and put an end to this ''drifting like a ship without a rudder'' course that we are pursuing on this question which is vital to property.

In short, I still insist that I was right in my dissent in *Stegall* v. *Bugh, supra.* I probably will not be on this Court when another mineral reservation case arises; but I predict that at some time the Court must fix a statewide date when it was generally recognized that oil and gas were minerals. We have before us in the case at bar as fine a record as will ever be presented on this question; and I think this is the time when it should be done; and I would still insist on January 1, 1900, as such date—or, if the ''beginning of the century'' is considered a more poetic date, then Jan. 1, 1901, would satisfy the situation.